IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

ROSEANN SAVEDRA,

        Plaintiff,

vs.                                  No. CIV 08-627 LFG

MICHAEL J. ASTRUE,
Commissioner of the
Social Security Administration,

        Defendant.

## MEMORANDUM OPINION AND ORDER

THIS MATTER comes before the Court on Plaintiff Roseann Savedra ("Savedra")'s Motion to Reverse or Remand Administrative Agency Decision [Doc. 17], filed July 17, 2009.  This case was remanded to the Commissioner on two earlier occasions.

### Procedural Background

Savedra first applied for Social Security Disability Insurance Benefits ("DIB") on November 3, 1999, alleging that she became disabled on September 7, 1999 due to a herniated disc, diabetes and depression. [Tr. 47-49, 60-62].  Her claim was denied at the initial and reconsideration stages, and Administrative Law Judge ("ALJ") Richard J. Smith held a hearing and issued his decision on March 23, 2001, denying benefits. [Tr.  9-16, 24- 59].

The Appeals Council thereafter denied Savedra's request for review [Tr. 4-5], and she appealed that decision to United States District Court.  In that case, Savedra and the Commissioner filed an agreed motion to reverse and remand and on March 27, 2002, the Court granted the motion and remanded the case for further administrative proceedings before the ALJ.  [Doc. 10 in Savedra v. Barnhart, No. Civ. 01-800 MV/LFG].

Pursuant to the Court's order, a second administrative hearing was held on August 9, 2002. On January 24, 2003, ALJ David R. Wurm issued his decision, again denying benefits. [Tr. 233-242, 488-519].  ALJ Wurm's decision then became the final agency decision, and Savedra appealed his

ruling to the United States District Court.  On December 9, 2003, the Court issued a Memorandum Opinion and Order, again remanding the case for further proceedings. [Doc. 17 in <u>Savedra v. Barnhart</u>, No. Civ. 03-240 KBM].

On remand, a third hearing was held on December 8, 2004 before ALJ Barbara L. Perkins, at which Vocational Expert ("VE") Pamela Bowman testified that Savedra was capable of performing certain jobs existing in the national economy. [Tr. 882-885].  ALJ Perkins denied Savedra's claim in a decision dated August 19, 2005.  [Tr. 708-720, 851-887].  On September 26, 2005, Savedra submitted written exceptions to ALJ Perkins's ruling [Tr. 704], and the Appeals Council entered a decision on November 27, 2007, affirming the ALJ's ruling.  [Tr. 700-703].

Savedra thereafter filed a request to reopen the Appeals Council's decision [Tr. 695-696], and on April 30, 2008, the Appeals Council issued a decision [Tr. 688-694], vacating its November 27, 2007 decision.  After considering additional information, the Appeals Council adopted ALJ Perkins' findings that Savedra is not disabled but modified the ALJ's finding that Savedra has a severe mental impairment, finding instead that Savedra's mental impairment is non-severe in that it does not significantly affect her ability to perform basic job tasks. [Tr. 692].  The Appeals Council also stated that, to the extent the VE testimony did not adequately support the ALJ's decision, it issued an "alternative finding and rationale" – *i.e.*, that Medical Vocational Rule 201.21 directs a conclusion that Savedra is not disabled.

Following this decision, Savedra changed attorneys.  Her new attorney, who currently represents her in this action, submitted additional medical records for the period between April 2004 and April 2008 and requested that the Appeals Council vacate its April 30, 2008 decision and remand for a supplemental hearing. [Tr. 522-523].  On March 17, 2009, the Appeals Council denied this request, noting that it considered the additional evidence submitted by counsel and found that it "is largely consistent with the medical findings and opinion already of record in your case." [Tr. 520].

2

The Appeals Council's April 30, 2008 decision now stands as the final decision of the Commissioner. 20 C.F.R. § 404.981; Fierro v. Bowen, 798 F.2d 1351, 1354 (10th Cir. 1986). S*ee also* Tr. 520-521, notifying Savedra that the April 30, 2008 opinion by the Appeals Council constitutes the "final decision" of the Commissioner.

### Factual Background

Savedra was born on December 23, 1958 [Tr. 60] and was 44 years old at the time of the most recent ALJ hearing. She graduated from high school in 1976 and since that time has worked as a store cashier and stocker, food service worker in a restaurant, police dispatcher, and school custodian. She held her last job as a custodian for approximately 12 years. [Tr. 75, 80, 103, 855-860]. Savedra alleges an onset date of September 7, 1999, when she injured her back while lifting heavy cafeteria tables at her custodian job. [Tr. 60, 105].

Savedra alleges disabling conditions including back pain, diabetes, and mental impairments including depression and anxiety.

### Standards for Determining Disability

In determining disability, the Commissioner applies a five-step sequential evaluation process.[1] The burden rests upon the claimant throughout the first four steps of this process to prove disability, and if the claimant is successful in sustaining her burden at each step, the burden then shifts to the Commissioner at step five. If at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends.[2]

Briefly, the steps are: at step one, claimant must prove she is not currently engaged in substantial gainful activity;[3] at step two, the claimant must prove her impairment is "severe" in that

---

[1]20 C.F.R. §§ 404.1520(a)-(f), 416.920(a)-(f) (2009); Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988).

[2]20 C.F.R. §§ 404.1520(a)-(f), 416.920(a)-(f)(2009); Sorenson v. Bowen, 888 F.2d 706, 710 (10th Cir. 1989).

[3]20 C.F.R. §§ 404.1520(b), 416.920(b)(2009).

3

it "significantly limits [her] physical or mental ability to do basic work activities . . . .;"[4] at step three, the Commissioner must conclude the claimant is disabled if she proves that these impairments meet or are medically equivalent to one of the impairments listed at 20 C.F.R. Part 404, Subpart P, App. 1 (2006);[5] and, at step four, the claimant bears the burden of proving she is incapable of meeting the physical and mental demands of her past relevant work.[6]

If the claimant is successful at all four of the preceding steps, the burden shifts to the Commissioner to prove, at step five, that considering claimant's residual functional capacity ("RFC"),[7] age, education and past work experience, she is capable of performing other work.[8] If the Commissioner proves other work exists which the claimant can perform, the claimant is given the chance to prove she cannot, in fact, perform that work.[9]

In the case at bar, the ALJ made the dispositive determination of non-disability at step five of the sequential evaluation, finding that Savedra could perform other jobs existing in the national economy. The Appeals Council adopted the ALJ's finding that Savedra is not disabled but, as noted above and as discussed in greater detail below, the Council modified the ALJ's opinion in two respects.

Savedra contends that the final administrative decision is not supported by substantial evidence, that the Commissioner did not carry his burden of proof, and that the Commissioner did not apply the correct legal standards.

---

[4]20 C.F.R. §§ 404.1520(c), 416.920(c)(2009).

[5]20 C.F.R. §§ 404.1520(d), 416.920(d) (2009). If a claimant's impairment meets certain criteria, that means his impairments are "severe enough to prevent [her] from doing any gainful activity." 20 C.F.R. §§ 404.1525(a), 416.925(a) (2009).

[6]20 C.F.R. §§ 404.1520(e),(f) 416.920(e),(f) (2009).

[7]The Commissioner has established RFC categories based on the physical demands of various types of jobs in the national economy. Those categories are: sedentary, light, medium, heavy and very heavy. 20 C.F.R. §§ 404.1567, 416.967 (2009).

[8]20 C.F.R. §§ 404.1520(g), 416.920(g) (2009).

[9]Muse v. Sullivan, 925 F.2d 785, 789 (5th Cir. 1991).

### Standard of Review and Allegations of Error

On appeal, the Court's review of the Commissioner's determination is limited.  Hamilton v. Sec'y of Health & Human Servs., 961 F.2d 1495, 1497 (10th Cir. 1992).  The Court's function is to consider whether the Commissioner's final decision is supported by substantial evidence, and whether the Commissioner used the correct legal standards.  Glenn v. Shalala, 21 F.3d 983 (10th Cir. 1994).  To be substantial, evidence must be relevant and sufficient for a reasonable mind to accept it as adequate to support a conclusion; it must be more than a mere scintilla, but it need not be a preponderance.  Trimiar v. Sullivan, 966 F.2d 1326, 1329 (10th Cir. 1992).

In Clifton v. Chater, 79 F.3d 1007, 1009-10 (10th Cir. 1996), the Tenth Circuit described, for purposes of judicial review, what the record should show:

> The record must demonstrate that the ALJ considered all of the evidence, but an ALJ is not required to discuss every piece of evidence.  Rather, in addition to discussing the evidence supporting his decision, the ALJ must also discuss the uncontroverted evidence he chooses not to rely upon, as well as the significantly probative evidence he rejects.  (citations omitted).

If supported by substantial evidence, the decision of the Commissioner is conclusive and must be affirmed.  The Court can neither re-weigh the evidence nor substitute its judgment for that of the Commissioner.  Hargis v. Sullivan, 945 F.2d 1482, 1486 (10th Cir. 1991).

In this case, the Commissioner, through the Appeals Council, found that Savedra has severe impairments including degenerative disc disease affecting her lumbosacral spine, and diabetes mellitus.  As noted above, the Appeals Council specifically rejected the ALJ's finding that Savedra's mental impairment is severe.  The Appeals Council also found that Savedra's subjective complaints are not fully credible, that she retains the RFC for the full range of sedentary work, and that the Medical Vocational guidelines (the "Grids") direct a finding of not disabled. [Tr. 693-694].

In her opening memorandum in this appeal, Savedra initially claimed a number of errors in ALJ Perkins' opinion.  In his Response to Savedra's Motion to Reverse or Remand, the Commissioner noted that Savedra's arguments were directed toward the ALJ's opinion, which is not the "final decision" of the Commissioner.  The Commissioner further argued that the final decision,

5

*i.e.*, the Appeals Council's April 30, 2008 opinion, is legally correct and supported by substantial evidence.

In the Reply, Savedra's counsel acknowledged there had been some confusion as to which decision was the "final decision" of the Commissioner.  Counsel argued that the allegations of factual and legal errors raised in plaintiff's opening memorandum with respect to the ALJ's opinion apply as well to the Appeals Council's decision, while acknowledging that some of the ALJ's findings were modified by the Appeals Council.  Counsel then proceeded to argue for reversal of the Appeals Council's decision.

Savedra makes the following allegations of error:  the Commissioner erred in finding that her mental impairment was non-severe; the Appeals Council's reformulation of her RFC was not supported by substantial evidence; both the ALJ and the Appeals Council erred in their credibility assessments; and the Appeals Council committed legal error in relying on the Grids for its finding that Savedra is not disabled.

After Savedra made arguments in her Reply directed toward the Appeals Council's decision, arguments which had not been raised in her initial memorandum, the Commissioner moved to strike the Reply.  In the alternative, the Commissioner asked that the Court allow a Surreply.  The Court denied the motion to strike but permitted the Commissioner to file a Surreply. [Doc. 24].

In his Surreply, the Commissioner argues that the Court should ignore any arguments raised for the first time in Savedra's Reply.  The Court specifically denies this request.  In the Order permitting the Surreply, the Court noted that it intended to decide this case based on a full briefing of the pertinent issues.  Having already denied the Commissioner's motion to strike Savedra's Reply, the Court finds no reason to reconsider the issue at this point.  It is clear that plaintiff's counsel inadvertently focused on the wrong decision in the opening memorandum, but there is no indication of any intent to mislead or deceive, nor is there any evidence that the Commissioner was prejudiced by counsel's error.  It has now been over ten years since Savedra first filed her

application for disability benefits, and the Court finds it preferable to decide this drawn-out case on the merits, rather than on a technicality.

### Analysis

Savedra raises four issues:  (1) whether the Commissioner erred in finding that Savedra's mental impairment was non-severe; (2) whether the Appeals Council's reformulation of Savedra's RFC was supported by substantial evidence; (3) whether the credibility assessment was erroneous; and (4) whether the Appeals Council committed legal error in relying on the Grids for its finding that Savedra is not disabled.

A.   Severity of Plaintiff's Mental Impairment

ALJ Perkins found that Savedra suffers from a mental impairment resulting in symptoms of anxiety and depression, and that the impairment is "severe" in that it has more than a minimal effect on her ability to perform basic work activities.[10] [Tr. 719] The Appeals Council modified this finding on grounds that the record contains no indication "that the claimant's mental impairment significantly affects her ability to perform the basic job tasks listed at 20 C.F.R. § 404.1521" [Tr. 692], and the Council therefore held that Savedra's mental impairment is non-severe.

In doing so, the Appeals Council pointed to the ALJ's finding that Savedra is cognitively capable of performing both simple and complex tasks, and noted further that the record did not indicate any limitations in Savedra's ability to interact with coworkers and supervisors. Furthermore, the Appeals Council held that although the ALJ did find limitations in Savedra's ability to interact extensively with the general public, such interaction is not a basic job function as set forth in the pertinent regulations.

Finally, the Appeals Council found that the evidence summarized in the ALJ's decision was not consistent with a severe mental impairment in that:  Savedra's testimony was unclear regarding specific mental limitations; Savedra had not returned to psychological counseling since March 2004;

---

[10]The ALJ also found that Savedra's mental impairment did not meet or equal in severity any category in the Listing of Impairments.

7

and although Savedra testified that her psychological symptoms were controlled by medication, she also said she had gone for months without taking her prescribed medications.

The Appeals Council concluded that the record failed to establish a severe mental impairment which would prevent Savedra from performing the basic job functions of unskilled employment [Tr. 692].

Savedra contends that the Appeals Council's finding is not supported by substantial evidence.  Savedra acknowledges that she has the burden at step two of showing a severe impairment but argues that only a *de minimis* showing is necessary to meet this burden.  She faults the Appeals Council for failing to discuss the findings of consulting psychiatrist Dr. Carlos Balcazar to the effect that Savedra is capable of doing only "simple" jobs and can perform only "two-step repetitive tasks."  She points to her inability to interact with the general public as evidence of a significant limitation in her capacity to complete work tasks, citing assessments of her treating psychiatrist, Dr. Walter Winslow, that she suffers from anxiety attacks and agoraphobia.  Savedra further argues that the Appeals Council committed legal error in its determination that interaction with the general public is not an essential job function under 20 C.F.R. § 404.1521. [Doc. 22].

The regulations define a "non-severe impairment" as one which "does not significantly limit [the claimant's] physical or mental ability to do basic work activities."  20 C.F.R. § 404.1521(a). Basic work activities are defined as those "abilities and aptitudes necessary to do most jobs"; examples of basic work activities involving mental capabilities include understanding, carrying out, and remembering simple instructions; use of judgment; responding appropriately to supervision, co-workers and usual work situations; and dealing with changes in a routine work setting.  20 C.F.R. § 404.1521(b).

In <u>Williams v. Bowen</u>, 844 F.2d 748, 750-51 (10th Cir. 1988), the Tenth Circuit described the claimant's burden at step two:

> Pursuant to the severity regulations, the claimant must make a threshold showing that his medically determinable impairment or

combination of impairments significantly limits his ability to do basic work activities . . . . Presumptively, if the medical severity of a claimant's impairments is so slight that the impairments could not interfere with or have a serious impact on the claimant's ability to do basic work activities, irrespective of vocational factors, the impairments do not prevent the claimant from engaging in substantial gainful activity, Bowen v. Yuckert, [482 U.S. 137, 107 S. Ct. 2287, 2293 (1987)]. If the claimant is unable to show that his impairments would have more than a minimal effect on his ability to do basic work activities, he is not eligible for disability benefits. If, on the other hand, the claimant presents medical evidence and makes the *de minimis* showing of medical severity, the decision maker proceeds to step three.

Although the Tenth Circuit characterizes the step-two showing as a "*de minimis*" requirement, the Tenth Circuit also holds that the mere presence of a condition is not sufficient to meet this requirement. Williamson v. Barnhart, 350 F.3d 1097, 1100 (10th Cir. 2003). A step-two finding that an impairment is non-severe is justified "where medical evidence establishes only a slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work ." Id., *quoting* SSR 85-28, 1985 WL 56856 at *3.

The issue in this case is whether the Appeals Council erred in its finding that Savedra's depression and anxiety symptoms would have only a minimal effect on her abilities to understand, carry out and remember simple instructions; to use judgment; to respond appropriately to supervision, co-workers and usual work situations; and to deal with changes in a routine work setting.

Savedra argues, first, that in making the determination that her mental impairment is non-severe, the Appeals Council ignored the assessment of consulting psychiatrist Dr. Carlos Balcazar. However, the Court agrees with the Commissioner's position that because Dr. Balcazar's report is consistent with the Appeals Council's decision, the Council's failure to comment on the report is not grounds for remand. *See*, Howard v. Barnhart, 379 F.3d 945, 947 (10th Cir. 2004) (when the record medical evidence does not conflict with the Commissioner's conclusion, it need not be specifically discussed).

9

At the consultative examination, Dr. Balcazar found that Savedra's general appearance was presentable, that she was able to provide pertinent information, and that both her attention span and her capacity to concentrate were preserved. [Tr. 166]. He noted that Savedra communicated affect and that her emotional reaction was appropriate to the circumstances and content of thought, even though her mood was "slightly on the depressed side." [Tr. 166]. He further found as follows:

> Both remote and recent memory were preserved . . . . She was able to perform simple mental arithmetical calculations, but could not do the serial sevens. Her answers to similarities and proverbs were quite concrete. In my opinion, her intelligence is at the low average level. Her line of thought was goal-oriented and I could not detect any loose associations, nor was delusional thinking present. Her sensorium was clear during the examination, and she denied either past or present hallucinatory experience.

[Tr. 166]. Dr. Balcazar concluded:

> I think this woman has adequate judgment to plan a work sequence. From a psychiatric standpoint, she could use tools and materials for simple jobs and could perform one or two-step repetitive tasks at a competitive rate. I would not foresee difficulty in her interactions with coworkers or supervisory personnel. Her main handicap is physical in nature . . . .

[Id., at 166-167].

This assessment is consistent with the record evidence of Savedra's treating mental health care providers. That evidence provides solid support for the finding that Savedra's depression and anxiety would have only a minimal effect on her abilities to understand, carry out and remember simple instructions; to use judgment; to respond appropriately to supervision, co-workers and usual work situations; and to deal with changes in a routine work setting. Dr. Balacazar's conclusions, as described above, are consistent with the finding of only minimal effect.

The medical evidence indicates that Savedra suffered from depression even before her back injury of September 7, 1999 [Tr. 203, 654, 659], but she increasingly complained of symptoms of depression and anxiety after the injury.

At an examination with a spine specialist on October 7, 1999, Savedra denied any depression or mood changes [Tr. 106]; however, on October 15, 1999, she was diagnosed with depression and given a prescription for Paxil, an anti-anxiety and antidepressant drug [Tr. 654]. On October 24, 1999, in a Disability Report in connection with her application for DIB, Savedra listed depression as one of the reasons why she cannot work. [Tr. 74, 81]. On October 30, 1999, she stated in her Daily Activities Questionnaire that she is "very moody and depressed," that she "feels useless," is "always worried," gets depressed when she is criticized, and feels self-conscious when she goes out in public. [Tr. 87, 80]. In spite of these symptoms, however, Savedra also stated that she gets along quite well with people in authority and has no problems getting along with family and friends. [Tr. 88-89].

The medical records of treatment for Savedra's physical conditions sporadically note symptoms of depression, anxiety and obsession, treated with medications, in November-December 1999; March-May, and October 2000; June 28, 2001, and August 2003. [Tr. 128, 196-203, 639, 649, 651-653, 771]. In addition, Savedra's primary care physician noted symptoms of anxiety, depression and tearfulness in November 1999, March 2000, February to May 2002, September 2002, March 2003. [Tr. 180-181, 183, 185, 187, 404, 410-414, 7878, 793]. However, none of these notes indicate that Savedra's symptoms would interfere with her abilities to understand or carry out work instructions, use judgment, or respond appropriately to supervisors, co-workers, or usual work situations.

Savedra received specific treatment for her psychological symptoms at the Socorro Mental Health Foundation ("SMHF") from November 1999 to June 2000, and from November 2000 to June 2004. [Tr. 144-164, 220-232, 264-277, 663-685]. The records of those treatments are as follows:

On November 1, 1999, a few months after her back injury, Savedra began seeing Ruby Mendez-Harris, LPCC (Licensed Professional Clinical Counselor) at SMHF. Savedra told Ms. Mendez-Harris that she was depressed due to her inability to work, but that she had also been

suffering from anxiety and nervousness since childhood.  She was self-conscious and felt that people were laughing at her.  The counselor noted that Savedra had little social contact outside the family and stated that she feared to be around people; however, Savedra also reported no problems in her ability to establish and maintain functional relationships.  The counselor further noted "evident signs of anxiety," including nail-biting, agitation and poor eye contact.  She diagnosed Savedra with major depressive disorder and panic disorder with agoraphobia.  Ms. Mendez-Harris recommended that Savedra have a psychiatric evaluation, help managing her medications, and that she attend both individual and group therapy sessions.  Savedra refused to attend group therapy.  [Tr. 150-163].

Savedra continued to see Ms. Mendez-Harris between November 1999 and June 2000.  During this time, Savedra declined again, on several occasions, to attend group therapy; she also refused to see a psychiatrist. [Tr. 145, 146, 225, 228, 229, 231].  In June 2000, Savedra became very angry with a caregiver at Socorro General Hospital, where she had gone with complaints of throat problems.  She discussed this incident with Ms. Mendez-Harris at a therapy session on June 23, 2000, stating that she felt something was "very wrong" with her throat but that the doctors didn't believe her.  [Tr. 220-222].

There are no notes of therapy sessions between June and November 2000.  On November 17, 2000, Savedra was evaluated by psychiatrist Dr. Walter Winslow at SMHF.  Savedra continued to see Dr. Winslow regularly between November 2000 and June 2004.

At his initial session with Savedra on November 17, 2000, Dr. Winslow noted that she appeared somewhat depressed and that she reported crying a lot and suffering from feelings of hopelessness and helplessness.  She was not suicidal but said she often felt that life was not worth living.  She also complained of panic attacks, two or three per week.  She told Dr. Winslow that the attacks began with "getting hot, flushed then frightened with palpitations, and shortness of breath" and that she saw another doctor about this, thinking it might be menopause, "but it wasn't." [Tr. 276].

12

At the November 17, 2000 examination, Savedra's mood was moderately depressed, and she had a mild panic attack in the doctor's office which lasted about five minutes. During the attack, the doctor reported that her face was flushed, she was perspiring and she looked frightened. In spite of the depression and panic attack, however, Savedra was able to answer all historical questions without difficulty. Her memory for both recent and remote events was intact, her thinking was logical and goal-oriented, and her insight and judgment were fair. There was no evidence of hallucinations, delusions or other psychotic symptoms. Dr. Winslow diagnosed Savedra with major depression, recurrent, and panic disorder with agoraphobia. He adjusted her medications and recommended that she continue her treatment with Ms. Mendez-Harris. [Tr. 276-277].

Savedra continued to see Dr. Winslow once or twice a month between December 2000 and June 2004. He continued to adjust her medications at these visits. Dr. Winslow's notes for this period indicate a generally improving trend. On December 14, 2000, Savedra reported that her depression was improving and that the panic has "much decreased." She told Dr. Winslow on that date the she had some mild panic attacks, but they were not severe. [Tr. 275]. On January 10, 2001, she stated that she was still somewhat depressed and was still having panic attacks, about two per week. She also reported mild to moderate anxiety. [Tr. 274]. On February 15, 2001, Dr. Winslow reported that Savedra was only minimally depressed and that, although she continued to report twice-weekly panic attacks and avoided crowds, he felt that her anxiety level was "pretty much under control" with the medication. [Tr. 273].

On April 4, 2001, Savedra stated that she was still having panic attacks, but only once or twice a week. She was still somewhat agoraphobic. Dr. Winslow noted that her mood was somewhat unstable but she did not appear to be deeply clinically depressed at that visit. [Tr. 272]. In May 2001, she reported to Dr. Winslow that her nephew recently committed suicide, and she was feeling depressed, with increased anxiety level and "a few panic attacks" in the past week. At this visit, he assessed her panic disorder as unimproved. [Tr. 271]. At the next visit, in June 2001, Savedra reported feeling a little better. Dr. Winslow noted that her mood was "slightly depressed

today but not seriously." He noted also that her anxiety seemed to be under control and that she had been experiencing few panic attacks. He assessed Savedra's panic disorder and agoraphobia as "partially improved." [Tr. 270].

On July 13, 2001, Savedra reported having two panic attacks per day. Indeed, she had a panic attack in Dr. Winslow's office on that date, lasting about 10 minutes. He noted that she became warm and sweaty, her face was flushed and her heart was pounding. He stated further, "She is also premenopausal and I am not sure how much of that might be hot flashes from hormonal changes"; however, he also noted that her family doctor did not think the attacks were related to menopause. Savedra reported that she was not feeling particularly depressed at this time and was more bothered by the panic attacks. Dr. Winslow assessed her mood as "pretty much normal" and stated that she is "generally well" and cognitively intact. He did note that her anxiety level was high and that she continued to have panic attacks, and he recommended Xanax to relieve the panic symptoms. [Tr. 269].

At a visit on August 10, 2001, Savedra reported panic attacks at a rate of 3 to 4 per week. Dr. Winslow found that she was still agoraphobic, as evidenced by the fact that she went to the store early in the morning when it was not crowded. He noted that her mood was minimally depressed. [Tr. 268]. On September 7, 2001, she reported "sweaty panicky anxiety feelings"; however, these symptoms were attributed to withdrawal from Lorazepam, which Savedra stopped taking on her own, without any medical advice to do so, due to a "terrible taste in her mouth." At this visit, Dr. Winslow noted that Savedra's mood hadn't changed much and that she appeared only minimally depressed. He did note obsessive symptoms and a high anxiety level, with continuing panic attacks (described variously as 1 to 2 per day, and 2 to 3 per week). [Tr. 267].

On October 4, 2001, Savedra reported that she was doing pretty well. She said she was still feeling a little depressed, "but she says part of that is due to . . . hormonal problems," and that she was getting her menstrual cycle regulated. Dr. Winslow noted mild to moderate depression and a

decreased anxiety level.  In general, he said, she was doing better.  He noted that her depression was in partial remission and that the panic disorder and agoraphobia were much improved. [Tr. 266].

At the next visit with Dr. Winslow, in November 2001, Savedra reported that she had been sick in the past month with bladder infections, yeast infections and menopausal symptoms, and that she was feeling quite panicky and very agoraphobic.  The doctor noted, however, that her affect was appropriate and that she appeared to be intact cognitively.  [Tr. 265].  At a visit on December 14, 2001, Savedra stated she was "doing quite well," that her mood was much improved on Paxil, and that she had been relatively free of panic attacks.  [Tr. 264].

At a visit with Dr. Winslow in February 2002, Savedra stated she was doing quite well and felt she had been helped a great deal by coming to SMHF.  She was still taking Paxil for depression and anxiety, and it was helping.  She was still having problems sleeping, but her appetite was good and she had gained some weight.  Dr. Winslow noted that both her depression and panic disorder were "much improved."  [Tr. 684].

Savedra missed an appointment with Dr. Winslow in March 2002, and at the April 2002 visit, she reported she had not been doing well.  Because of the missed appointment she ran out of Paxil and had not taken it for two weeks.  This led to a recurrence of her depressive feelings, with an increased in compulsive symptoms such as nail biting. [Tr. 684].  The same thing occurred in May 2002:  she missed an appointment and ran out of Paxil, and at the next visit with Dr. Winslow on June 19, 2002, Savedra said she was feeling more depressed and had been unable to sleep.  He assessed her as moderately depressed, with some regression in her panic disorder/agoraphobia since she stopped taking Paxil.  She had not had any severe panic attacks, however.  He put her back on Paxil. [Tr. 683].

In July 2002, Savedra was still moderately depressed.  Her anxiety level had decreased, but this was because she stayed home much of the time.  Dr. Winslow assessed her with depression, panic disorder and agoraphobia, and mild to moderate obsessive-compulsive disorder ("OCD"). [Tr.

15

682].  She had a similar evaluation on August 21, 2002, Dr. Winslow noting that Savedra was still quite agoraphobic and socially isolated. [Tr. 681].  In September 2002, she reported that the Paxil was helping with her depression, anxiety and panic.  She was less agoraphobic, although she still preferred to stay out of places where there are a lot of people.  Dr. Winslow noted that Savedra was very socially isolated and made little attempt to keep up social relationships outside the home; she told him, "I just like to stay at home."  He noted that the Paxil seemed to be helping both her depression and her anxiety, with no side effects.  He assessed her panic disorder and agoraphobia as improved, "but she still prefers to be socially isolated." [Tr. 680].

In October 2002, Dr. Winslow noted that Savedra was experiencing mood swings and was very anxious, with OCD symptoms including pulling out her hair when she felt nervous. [Tr. 679]. However, by December 2002, Savedra reported that her OCD symptoms, including hair-pulling and obsessive counting, had decreased and she was getting good results from the Paxil.  Her anxiety level was also somewhat relieved with Paxil, and she was not depressed. [Tr. 678].

In February 2003, Savedra reported continued OCD symptoms, and drowsiness which Dr. Winslow attributed to her medication.  He reduced her dosage of Paxil. [Tr. 677]. By March, the drowsiness had resolved, and Savedra reported a decrease in her OCD symptoms. [Tr. 676].  In May 2003, Savedra was doing better.  She was not having panic attacks, her hair-pulling had decreased, and her mood was even and not depressed.  Dr. Winslow said that her "[p]anic and anxiety are under control with Paxil."  His assessment of that date did not include depression; it did include panic disorder but without agoraphobia, and he noted an improvement in the OCD symptoms.  [Tr. 674]. A similar assessment was made in July 2003. [Tr. 673].

In September 2003, Savedra reported that she was doing fine.  Her mood was stable and she had experienced no panic attacks in the preceding month. [Tr. 672].  In October 20003, she told Dr. Winslow that she was doing pretty well on the Paxil.  She was not having much trouble with panic attacks and was able to go shopping by herself.  She was still "pulling a little hair," but that had

16

improved, too. [Tr. 671]. Similarly, in December 2003, Savedra stated that she was still a little phobic about going into crowds, but that she could go into stores if they were small and not crowded. Dr. Winslow noted that she has "[o]ccasional agoraphobic feeling when she goes into public places but she manages to get things done as long as things are not too crowded." He stated that she is "doing well on present medications." [Tr. 670].

Savedra's condition took a dip in January 2004, when she reported some anxiety attacks and trouble going into stores by herself. Her anxiety level was relatively high, but the hair pulling had decreased. [Tr. 669]. By February 2004, she was doing somewhat better. Her mood was not depressed, although she did report having 2 to 3 panic attacks per week. [Tr. 668]. In May, she reported some family problems causing her stress; however, she was able to drive her husband into Albuquerque from Socorro for a medical treatment and to help her mother-in-law with recovery from knee replacement surgery. While the family issues were stressful, she reported to Dr. Winslow that she was able to keep most of the panic attacks under control. Her anxiety level was very high at times, but she said the anxiety and panic attacks were "settling down now." [Tr. 667].

Savedra's last recorded visit with Dr. Winslow occurred on June 15, 2004. At that time she said she was doing well. The panic attacks were milder and much less frequent, her compulsive hair-pulling habit was greatly diminished with the Paxil, and her mood was not depressed. Dr. Winslow's assessment did not include depression; he noted that Savedra still had panic disorder, but without agoraphobia. Her OCD symptoms were improved. [Tr. 666].

The record of treatment with Dr. Winslow does not reflect any impairment of Savedra's ability to understand, carry out or remember simple instructions. To the contrary, he describes her as able to give an accurate history and notes on many occasions that her cognitive functions are intact. He assessed her on one occasion with "fair" judgment, but there is no indication that her judgment was so reduced as to interfere with her ability to carry out work assignments. Although Dr. Winslow noted on several occasions that Savedra was socially isolated, he also noted that she

reported no trouble getting along well with people in authority and with family members.  While his assessments initially indicated that Savedra's panic disorder was accompanied by agoraphobia, his later assessments stated that agoraphobia was no longer part of the diagnosis, and he also noted that Savedra responded quite well to Paxil.  By the time of the later treatment records, Savedra was able to go to the store, take her husband to Albuquerque, and help her mother-in-law during recovery from knee surgery.

In general, the medical records from SMHF indicate that Savedra received help from her treatment there and that her symptoms were reduced, and in some cases eliminated, with therapy and medications.  Savedra testified at the December 2004 ALJ hearing that, although she stopped attending therapy sessions in March 2004 when her husband suffered a stroke, her symptoms of depression and anxiety were alleviated with the medication she was prescribed by her physician, Dr. Sloan. [Tr. 869-870].  The record shows that Savedra's psychological symptoms responded well to medication, and there is nothing in the records of her visits to Dr. Winslow which indicates that her depression, anxiety or OCD would interfere with her ability to perform basic work duties, to understand and remember instructions, to use reasonable judgment and to interact with others in a work setting.  This conclusion is consistent with Dr. Balcazar's findings.

Savedra also argues that the Appeals Council misapplied the law when it found that extensive interaction with the public is not a "basic job function" under 20 C.F.R. § 404.1521.  She points out that "responding appropriately to . . . usual work situations" is one of the functions listed in § 404.1521, and argues that her agoraphobia is "a significant limitation affecting her ability to complete work tasks."  [Doc. 22, at 4].

As noted above, Dr. Winslow assessed Savedra as having panic disorder with agoraphobia on several occasions.  However, his treatment records for Savedra also make clear that her symptoms were significantly reduced when she remained on her medications; twice when she missed appointments and failed to refill her prescriptions for Paxil, her symptoms increased but were

later alleviated when she returned to the medication.  Later on in the period of treatment, Dr. Winslow noted that Savedra no longer had agoraphobia.  With treatment, she was able to go to stores on her own, go to doctor appointments, and drive her husband to another city for medical treatment.

Savedra points to a regulation stating that "[s]ocial functioning in work situations may involve interactions with the public, responding appropriately to persons in authority (e.g., supervisors), or cooperative behaviors involving coworkers."  20 C.F.R., Part 404, Subpart P, App. 1, § 12.00(C)(2).  There is no indication in the record that Savedra has difficulty dealing with persons in authority or with coworkers.  She appears to be able to interact with the public, in spite of her fear of crowded situations, in that she can go to stores on her own and can assist her husband with his medical transportation and treatment needs.  The record indicates that Savedra prefers to remain at home and does not initiate social contacts outside her family, and that she prefers to avoid crowds and extensive interaction with the public.  However, there is nothing in the record to indicate that these characteristics would prevent her from responding appropriately to usual work situations.

The Court therefore rejects Savedra's argument that the Appeals Council erred in finding her mental impairment non-severe, and upholds that finding as fully supported by the record.

B.  RFC for a Full Range of Sedentary Work

As noted above, in her opening brief Savedra focused on the ALJ's opinion.  In her initial memorandum, Savedra argued that the ALJ erred in finding that she was physically capable of performing a range of light work, because that finding contradicted record medical evidence which restricted her to sedentary work only. [Doc. 18, at 12-14].  Thus, Savedra concedes that the record supports a finding that she is physically capable of performing sedentary work.  In her Reply brief, however, she argued that she cannot perform a full range of sedentary work because of her non-exertional mental limitations, which restrict her to jobs that involve simple one- or two-step repetitive tasks. [Doc. 18, at 15].

The Appeals Council modified the ALJ's finding of a capacity for light work, holding instead that Savedra could perform a full range of sedentary work. The Appeals Council found that:

> the limitations assessed in the [ALJ's] decision are . . . consistent with an ability to engage in the full range of sedentary employment. As discussed above, the record does not support a conclusion that the claimant has a severe mental impairment that would prevent her from performing the basic job functions of unskilled employment.

[Tr. 692].

Savedra now contends that this modified RFC finding is unsupported by the record because her mental impairment precludes her from responding appropriately to "usual work situations," and restricts her to sedentary jobs that require only "one or two-step repetitive tasks" according the Dr. Balcazar's evaluation. She further argues that the evidence does not support a finding that she can perform basic work-related activities on a sustained basis – that is, 8 hours a day, 5 days a week – citing SSR 96-9p [Doc. 22, at 5-6].

The record supports the finding that Savedra is capable of performing a full range of unskilled work in the sedentary category. Unskilled work is defined in the regulations as "work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time . . . and [for which] little specific vocational preparation and judgment are needed." 20 C.F.R. § 404.1568(a).

As discussed above, nothing in the records of Savedra's psychological and psychiatric treatment indicates that she is incapable of doing work that involves simple duties, with little or no judgment and which can be learned in a short period of time. Indeed, she had a long history of productive work prior to her back injury; her most recent job with the Socorro school system lasted 12 years. [Tr. 857]. That is not the job history of a person with poor judgment, incapacity to get along with supervisors and co-workers, or inability to do simple duties. Savedra was a valued employee before she sustained her back injury, and although, along with many other workers, she

clearly suffers from life stressors and resulting psychological pressures, there is nothing in the record to support a finding that she cannot work because of these impairments.

Savedra argues that the Appeals Council ignored the regulatory criteria set forth in SSR 96-9p. In that ruling, the Social Security Administration noted that a substantial loss of the ability to meet the basic work-related activities on a sustained basis (*i.e.*, 8 hours a day, 5 days a week) will substantially erode the unskilled sedentary occupations base and would justify a finding of disability, if the claimant is unable to perform the following "mental activities . . . generally required by competitive, remunerative, unskilled work":

- Understanding, remembering, and carrying out simple instructions.
- Making judgments that are commensurate with the functions of unskilled work--i.e., simple work- related decisions.
- Responding appropriately to supervision, co- workers and usual work situations.
- Dealing with changes in a routine work setting.

SSR 96-9p, 1996 WL 374185, at *9.

These qualities are nearly identical to the criteria for finding a "severe" mental impairment and, as discussed above, the record supports a finding that Savedra's mental impairment is non-severe. No medical provider has opined that Savedra is unable to understand, remember or carry out simple instructions. None has found that she cannot make judgments commensurate with simple, work-related decisions. And none has stated that because of her psychological condition she in incapable of responding appropriately to supervisors, co-workers, or usual work situations.

The Court therefore rejects Savedra's contention that the Appeals Council erred in finding that she can perform a full range of unskilled sedentary work, in spite of her mental impairments.

C. Credibility Assessment

Savedra next argues that neither the ALJ's nor the Appeals Council's credibility assessments are supported by substantial evidence.

In its April 30, 2008 decision, the Appeals Council made the specific finding that Savedra's subjective complaints are not fully credible "for the reasons identified in the body of this decision." [Tr. 694]. The decision does not provide any detailed examples of portions of the record supporting this credibility finding; however, the Council notes that it "considered the claimant's statements concerning the subjective complaints . . . and adopts the Administrative Law Judge's conclusions in that regard." [Tr. 692]. In addition, the Council considered the supplemental medical records submitted by Savedra's attorney after the ALJ's decision was entered, and found that those records did not alter the determination.

ALJ Perkins stated that she had "given careful consideration to Ms. Savedra's subjective allegations concerning her symptoms, particularly pain, and the functional limitations caused by those symptoms." The ALJ further noted that Savedra's "subjective claims may only be accepted as credible to the extent that they are reasonable in view of the objective medical evidence in the case file," citing 20 C.F.R. § 404.1529, and SSR 96-7p. [Tr. 712-713].

The ALJ assessed the credibility of Savedra's subjective complaints with respect to the three impairments which the ALJ found to be severe, *i.e.*, degenerative disc disease affecting her lumbosacral spine, diabetes mellitus, and mental impairments including anxiety and depression.[11] The ALJ applied the appropriate test for assessing credibility as set forth in applicable Tenth Circuit law. [Tr. 713].

With respect to the spine impairment, the ALJ pointed to portions of the record in which Savedra's treating physicians noted that Savedra exaggerated the problems she has due to pain; indications on the record that Savedra is taking narcotic medications because she is addicted to them, rather than because she has chronic, intense pain; and the fact that Savedra stated she was considering back surgery but was hesitant to do so because of her diabetes, whereas the record indicates that no treating medical source ever recommended surgery. [Tr. 713-714]. The ALJ

---

[11]As noted above, the Appeals Council disagreed with the ALJ as to the mental impairments and found them to be non-severe.

further noted that although Savedra alleged significant problems related to diabetes, especially with neuropathy in her extremities, and chronic fatigue and tingling in the legs, feet and toes, she has not reported these problems to treating or examining health care providers. Rather, the medical records show only an occasional reference to "complications from diabetes." [Tr. 715].

In general, the ALJ also noted inconsistencies in Savedra's statements as to her activities of daily living and the day-to-day effects of her impairments. For example, the ALJ noted that at the December 2004 hearing, Savedra testified that she is unable to do housework or shop for groceries more than twice a month; however, she also testified that she takes care of her husband, without assistance, since he had a stroke in March 2004. [Tr. 716]. The ALJ also pointed out the fact that Savedra was not always in compliance with her treating doctors' recommendations; for example, she was advised to stop smoking but continued to do so and there is no indication on the record that she had any intention of quitting nor that she made any effort to do so; in addition, she sometimes went for months without taking her prescribed medications. [Id.].

"Credibility determinations are peculiarly the province of the finder of fact, and we will not upset such determinations when supported by substantial evidence." Diaz v. Sec'y of Health & Human Servs., 898 F.2d 774, 777 (10th Cir. 1990). See also, Casias v. Sec'y of Health & Human Servs., 933 F.2d 799, 801 (10th Cir. 1991) (the Court should "defer to the ALJ as the trier of fact, the individual optimally positioned to observe and assess witness credibility"). Although credibility findings must be closely and affirmatively linked to substantial evidence and not merely conclusions in the guise of findings, Huston v. Bowen, 838 F.2d 1125, 1133 (10th Cir. 1988), a "formalistic factor-by-factor recitation" is unnecessary, as long as the Commissioner provides examples of specific evidence upon which he relies to support his credibility findings. Qualls v. Apfel, 206 F.3d 1368, 1372 (10th Cir. 2000).

With respect to allegations of pain, a claimant's testimony is insufficient to establish disability. Talley v. Sullivan, 908 F.2d 585, 587 (10th Cir. 1990).

> A claimant's subjective allegation of pain is not sufficient in itself to establish disability. Before the ALJ need even consider any

> subjective evidence of pain, the claimant must first prove by objective medical evidence the existence of a pain-producing impairment, that could reasonably be expected to produced the alleged disabling pain.

Thompson v. Sullivan, 987 F.2d 1482, 1488 (10th Cir. 1993) (citations omitted).  The framework for analyzing a claimant's evidence of pain consists of the following elements:  (1) whether the claimant established a pain-producing impairment by objective medical evidence; (2) if so, whether there is a loose nexus between the proven impairment and the claimant's subjective allegations of pain; and (3) if so, whether, considering all the evidence, both objective and subjective, claimant's pain is in fact disabling.  Luna v. Bowen, 834 F.2d 161, 163 (10th Cir. 1987).

In order for Savedra to establish that her subjective symptoms, including pain, are disabling, there must be medical evidence showing that the pain is "so severe, by itself or in conjunction with other impairments , as to preclude any substantial gainful employment."  Brown v. Bowen, 801 F.2d 361, 362-363 (10th Cir. 1986).  In determining whether subjective symptoms such as pain are disabling, the Commissioner should consider such factors as the levels of medication and their effectiveness and side effects, how extensive the claimant's attempts have been to obtain relief from pain, the frequency of medical contacts, the nature of daily activities, and the consistency or compatibility of the non-medical testimony with objective medical evidence.  Huston v. Bowen, supra, at 1132.

The Court finds sufficient evidence on the record to support the ALJ's finding that Savedra is not entirely credible, a finding which was adopted by the Appeals Council after it considered the additional medical evidence submitted by Savedra.  Assuming that Savedra established the first two prongs of the Luna v. Bowen test – i.e., that objective medical evidence establishes the pain-producing impairments of spinal problems and diabetes, and that there is at least a loose nexus between these impairments and Savedra's subjective allegations of pain – there is sufficient evidence on the record to support the finding that Savedra is not entirely credible.

Savedra points to her many visits to Dr. Bhasker, her primary care physician, between August 2001 and December 2003, at which she complained of back and leg pain and during which

Dr. Bhasker noted positive leg-raise signs. [Doc. 18, at 19-21]. Savedra faults the ALJ for focusing solely on the January 28, 2004 note by Dr. Bhasker indicating that he would no longer treat Savedra due to a disagreement over his concern that she was becoming addicted to pain medication, and ignoring the fact that, for over two years, he treated Savedra for pain symptoms related to her back condition. [Id., at 21].

There is no question that Dr. Bhasker treated Savedra for a objectively determinable medical condition which could be expected to cause pain. The Court also assumes a loose nexus between Savedra's subjective complaints of pain and her back condition. But it was not error for the ALJ and the Appeals Council to take into account Dr. Bhasker's professional opinion that Savedra was becoming dependent on narcotic pain-killers, an opinion so strong that he refused to continue to treat her when she insisted, in a combative manner, that he give her the medication, as documented at the time in his medical notes. This is evidence that Savedra's need for the narcotic prescription was based on a physical addiction rather than on intolerable pain. The Commissioner was entitled to consider this evidence, and it was not error to draw the inference described above.

The medical records from Dr. Bhasker, related to his treatment of Savedra, begin on September 7, 1999, the day Savedra injured her back lifting the heavy cafeteria table. He noted pain in her lower back and sacral area. X-rays showed a defect on the right side. He assessed her with a lower back sprain and prescribed Motrin and Vicodin for pain, and Soma as a muscle relaxant. [Tr. 123]. Savedra continued to complain of pain at subsequent visits to Dr. Bhasker in September 1999. [Tr. 119-121].

A CT scan was done on September 18, 1999 which showed no fractures or lesions, but significant spurring at the facet joints. The CT scan also showed a mild stenosis (narrowing) of the spinal canal at the L4-5 level, due to a combination of disc bulging and some thickening of the ligaments, plus a possible minimal disc bulge at the L5-S1 level. [Tr. 126]. In late September to mid-October 1999, Dr. Bhasker's notes indicate that Savedra continued to experience pain, and he referred her to an orthopedic surgeon in Albuquerque. [Tr. 113, 115-116].

On September 29, 1999, Savedra was examined and evaluated by orthopedic surgeon Richard N. Castillo at New Mexico Spine in Albuquerque. On examination, Dr. Castillo noted that Savedra's gait was normal, her posture was normal without any evidence of convexity or concavity of the spine, her range of motion permitted her to forward flex and touch her knees, and her deep tendon reflexes and muscle strength were also normal. She could not squat "due to perceived pain," and her sitting and supine sciatic stress tests were negative. He noted that she reported decreased sensation to pinprick throughout the entire lower left leg "which is nonphysiologic." [Tr. 110].

Dr. Castillo noted further, "Her Waddell's are essentially 3/5, displaying an increased response to pain behavior consisting of tenderness, regionality and overreaction." [Id.]. A finding of three Waddell's signs is an indication that the patient is exaggerating her symptoms. See, Kirby v. Astrue, 568 F. Supp. 1225, 1233-34 (D. Colo. 2008).

Dr. Castillo also examined the back x-rays taken on September 9, 1999, noting her back was normal in appearance. He also interpreted the CT scan taken on September 18, 1999 to be normal, noting his disagreement with the diagnosis of stenosis at L4-5 and concluding "[t]here is certainly no evidence of acute pathology that would explain the patient's left leg symptoms." [Id.].

Dr. Castillo's assessment was "[m]echanical low back pain with subjective complaints of left leg paresthesias [decreased sensation]. At this time, there is no objective evidence." He concluded as follows:

> I discussed these findings in detail with the patient. I have reassured her that from an orthopedic surgical standpoint that I would consider her stable. I will go ahead and refer the patient to Dr. Radecki in our practice to see if she may be a reasonable candidate for a back rehab program. At this time, I feel the patient could return to work at least in a light duty capacity until she can be evaluated. I see no need for any further diagnostic intervention.

[Id.].

Dr. Richard T. Radecki of New Mexico Spine examined Savedra on October 7, 1999. His speciality is Physical Medicine and Rehabilitation. At this visit, Savedra told Dr. Radecki that immediately upon the September 7 injury, she felt a sharp, stabbing, numbing, aching and burning pain across her buttocks in a straight line from left to right. She said that the pain seemed to go

down her leg, primarily to the knees but at times all the way down to her foot to the extent that she

could not put any pressure on it.  She rated her pain as 8 out of 10, throughout the entire day.  Dr.

Radecki noted that the 0-to-10 pain scale means that "8 is screaming with pain and 1 is a nuisance."

[Tr. 105].  Dr. Radecki's notes indicate that at one point Savedra stated that medication does not

help with pain relief; however, at another point, she said that pain medications seem to be helpful

while muscle relaxants were not. [Id.].  She was taking Vicodin and Percocet, but was "somewhat

fuzzy on the frequency and how she takes her medications." [Id.].

>     With respect to Savedra's subjective complaints of pain, Dr. Radecki wrote:

>> The patient states that all activity causes pain and the only time when
>> it seems to decrease is if she rests.  Standing, sitting, lying down are
>> all about equal and she has pain with walking in her legs and back.
>> She sometimes has difficulty sleeping as well as being awakened
>> with pain.  She does not have any pain free periods.  Mild activity
>> makes her feel worse.

[Id.].

>     In contrast to these assertions of pain, Dr. Radecki noted on examination that Savedra was

able to sit comfortably in a chair for approximately a half hour, without any antalgic symptoms (*i.e.*,

a posture or gait assumed so as to lessen pain) or facial expressions.  He noted further that she was

able to get up out of the chair without using the hand rest, walk to the examining table, get up on the

table and lie down, all without any antalgic expressions, even though she complained of pain

throughout the examination.  He also noted that Waddell's signs were present, and that palpation

of the spine in the thoracic, lumbar and lumbosacral resulted in complaints of pain although he could

find no muscle tightness, muscle spasm, trigger points or other objective difficulties.  He wrote

further that palpation over the gluteal muscles and sacroiliac joints "is discomforting according to

her," with complaints of pain in a band-like shape across her upper buttocks and lumbosacral area.

[Tr. 106-107].

>     Dr. Radecki assessed Savedra with lower back pain, mechanical in nature; possible

depression; a history of diabetes with no symptoms or signs of diabetic neuropathy and normal

sensory exam to light touch and pinprick on lower extremities; and "[s]ymptom magnification per Waddell's signs."  He concluded:

> Overall, it is very important to try to get the patient to increase her activity as tolerated . . . .  [She is referred for physical therapy].  I also have job modifications to light duty . . . .  This would be very important to try to get her more active, since her month off and her statement that she does not believe she will ever be able to return [to work] only increases the difficulty of possibly assisting the patient in knowing she is healthy, but with pain.  She can continue taking her Percocet at this present time, thought it would be very important to try to wean her off of [t]hese over time . . . .  I did speak to Dr. Bhasker in Socorro.  He sees the overall prognosis as limited in that the patient seems to be already set or difficult to understand and to assist . . . .  The goals are to try to instill good sleep, better activity as tolerated and try to see if there is any kind of light duty activity at present in the school system to assist her in reintegrating with her workplace.

[Tr. 107-108].

On October 29, 1999, Savedra appeared for an interview in connection with her application for disability benefits.  The interviewer noted that Savedra had no difficulty in standing and sitting during the interview, and she wrote that Savedra appeared aware, alert and "a bit self-absorbed." [Tr. 85].

After Savedra was evaluated by Drs. Castillo and Radecki in Albuquerque, she continued to be followed by her primary care physician in Socorro, Dr. Bhasker.  At a visit on November 4, 1999, Dr. Bhasker noted that Savedra was "complaining bitterly of her back," and although she appeared to have tenderness throughout the back with radiation down the legs and reported that physical therapy is "not much use," he noted that she did not walk with a limp, had good range of motion and did not appear to be in any acute pain.  He recommended that she be "continued on light duty." [Tr. 188].

At a visit on December 2, 1999, Dr. Bhasker noted that Savedra was very upset, anxious and crying and stated that she was unable to walk without pain.  She was limping slightly and had decreased range of motion of her back, but she appeared able to walk without too much trouble. [Tr. 185].  On February 3, 2000, she complained of leg pain and discomfort from the hip to the ankle.

She was again very upset and anxious, and Dr. Bhasker noted "I am unsure of the symptoms as to the etiology of them." He continued her pain medication and recommended that she stay off work for one month. [Tr. 183]. She continued to report tenderness and pain at visits to Dr. Bhasker in March through July 2000. [Tr. 179-181, 215-217].

Dr. Bhasker's notes from April 2001 to October 2002 indicate that Savedra continued to complain of pain in her back and leg, loss of sensation in her right leg (noted on August 6, 2001), as well as in her left leg (noted on March 20, 2002). At many of these visits, Dr. Bhasker noted positive leg raise signs. He continued her on pain medications, including Vicodin, throughout this time [Tr. 404-423], although on September 30 and again on October 21, 2002, he specifically counseled Savedra to decrease her medication, noting on October 21 that, "[s]he is admonished about the addiction potential of the pain medication, but she states that is the only way that she can continue to function." [Tr. 403, 404].

The visits to Dr. Bhasker continued to the end of 2002 and throughout 2003. During much or all of this time, Savedra was taking Vicodin every six hours. [Tr. 774-795]. Dr. Bhasker noted throughout this period that Savedra continued to complain of pain and stated that she couldn't function well without the medication. [*See, e.g.*, Tr. 782, 783, 785, 787, 792].

On December 3, 2003, Dr. Bhasker wrote that Savedra was asking for a higher dose of hydrocodone (Vicodin) "because the pain is so persistent that she is unable to live with that." [Tr. 776]. Dr. Bhasker told her at this visit "that she should not be taking any more pain medication," and he refused to increase the dosage. [Id.].

On December 30, 2003, Dr. Bhasker wrote that Savedra was "very bitterly complaining about her back pain" and asked to be referred to a pain clinic. He noted that he would try to get an appointment for her with a Dr. Whalen, a pain specialist, and that this would have to be done through risk management. [Tr. 773]. There is no indication on the record that Savedra ever saw Dr. Whalen, but apparently an appointment was made with a Dr. Hermes.

29

On January 28, 2004, Savedra returned to see Dr. Bhasker for the last time.  His notes of that visit are as follows:

> At the present time, the patient is demanding more medication.  She states her lawyers have stated that she should be seen by another doctor other than Dr. Hermes.  The appointment for Dr. Hermes has already been made.  It has been approved by risk management, and she is very adamant that she will not see Dr. Robin Hermes.  The patient is very argumentative and combative after I explained to her that she will not be getting any increased dose in her pain medication.  She states I should go ahead and give her that, and she does not need to see anybody in Albuquerque.  I have explained to her that I need a second opinion on the amount of pain medication and muscle relaxants she is taking, and she continues to be combative and argumentative.  At the present time, I will write a letter to her lawyer and the patient that I will no longer see this patient as she is not compliant and she does not listen to our suggestions for treatment.  We will no longer see this patient.

[Tr. 773].

As noted above, the Court finds that the ALJ and the Appeals Council properly took into account the record evidence indicating that Savedra's personal physician, who treated her for several years, was concerned that she was becoming dependent on pain medications, primarily the narcotic Vicodin, because she made increasingly insistent demands for a higher dose and refused to consult with a pain specialist as an alternative to continuing on the medication.

It is certainly true, as Savedra argues, that Dr. Bhasker's notes demonstrate that she consistently complained of pain over a period of several years, and the notes further document a back problem which reasonably could be expected to produce pain.  The issue is whether Savedra's subjective complaints as to the extent of her pain, and its effect on her ability to work, were entirely credible.  The fact that Savedra refused to try an alternative therapy and continued to demand more medication, contrary to her physician's advice, is relevant to whether her complaints of pain were based on real symptoms or rather were an attempt to obtain higher doses of a narcotic medication.  The ALJ and the Appeals Council found that Savedra's relationship with her treating physician, and the circumstances of its termination, were relevant to the issue of her credibility.  This was not reversible error.

30

On May 19, 2008, Savedra's new counsel requested that the Appeals Council reopen the decision and allow him to submit additional medical records, not previously considered by the ALJ or the Appeals Council, for the period from June to December 31, 2004, Savedra's date last insured. These records are notes of visits by Savedra to Dr. John Henry Sloan, a specialist in physical medicine and rehabilitation at the Manzano Medical Group in Albuquerque. [Tr. 686]. On June 20, 2008, counsel submitted the records to the Appeals Council, arguing that they support and strengthen Savedra's claims of disabling pain, in that a CT scan done on July 6, 2004 showed a previously-undiscovered facet fracture and moderate stenosis of the spinal canal. In addition, counsel argued, the new records support Savedra's claim that her diabetes complicates both her pain management and her potential for surgery. [Tr. 522-523].

The Appeals Council denied the request for reopening. In a decision dated March 17, 2009, the Council stated that it considered the additional evidence but found that it "either duplicates or provides information that is largely consistent with the medical findings and opinion already of record in your case." [Tr. 520]. The Council further commented that "[t]he Administrative Law Judge provided additional reasons beyond lack of surgery to find that your complaints were not fully credible." [Id.]. Savedra argues that the records from Dr. Sloan constitute new evidence which supports the credibility of her complaints of back pain. Savedra points to comments by Dr. Sloan to the effect that "her pain is real," and that because surgery was not recommended due to her diabetes, he would increase her pain medications. [Tr. 527-528].

The records from Dr. Sloan show the following:

The first record of treatment by Dr. Sloan is for a visit on April 12, 2004. X-rays taken that date showed normal disc space height at L5, mild signs of osteoarthritis and some slight narrowing, but no obvious spinal pathology. In general, the x-rays showed no "dramatic change" from prior studies done in July 2001. [Tr. 797]. At the examination on that date, Savedra stated that she had experienced "a lot of pain" ever since her back injury in September 1999, and that she had "pins and

needles," apparently in her leg, which she attributed to her diabetes. [Tr. 798]. She complained of back pain, leg pain, and numbness and tingling in her feet. [Tr. 799].

At the time of this visit, Savedra was taking four Vicodin pills per day. [Tr. 798-799]. Dr. Sloan ordered a nerve conduction study and physical therapy and decided to keep Savedra's medications unchanged for at least a few weeks, and then "see if the other interventions will help reduce her pain med needs." [Tr. 799]. He added Elavil to her medication regimen to help with sleep. [Id.].

The nerve study was done approximately June 7, 2004. Dr. Sloan noted that the report indicated no evidence of lumbar radiculopathy (i.e., disease of the nerve roots), but some sensory deficits on the left, possibly related to her diabetes. He ordered a CT scan of the lumbar spine "to better assess her spinal anatomy." [Tr. 802]. The CT scan was done on July 6, 2004, and Dr. Sloan saw Savedra again on July 8. The CT scan showed "moderate canal stenosis at L4-5." It also showed a facet fracture on the left at L4. He wrote, "I told the patient this may be something she was born with, or it could possibly be related to her work-related injury." He stated that Savedra did not want an epidural injection and would not consider surgery; however, he referred her to Dr. Claude Gelinas "to get his perspective on the fracture as described on the CT scan." [Tr. 529].

Sometime in July or early August 2004, Savedra was seen by Dr. Gelinas. At a follow-up visit on August 5, 2004, Dr. Sloan noted that Dr. Gelinas felt Savedra had a "possible facet fracture," as well as stenosis. Dr. Gelinas's opinion was that Savedra had the options of continuing with pain med management, or else undergoing a fusion operation at L4-5. [Tr. 530]. Dr. Sloan concurred in this assessment and discussed the possibility of surgery with Savedra at the August 5, 2004 visit. He noted that Savedra's diabetes would complicate her care and potential for surgery. Savedra stated that she did not want the surgery, which Dr. Sloan noted as a "valid apprehension," given her need to care for her disabled husband and the fact that she had diabetes and past vascular injury. He wrote that "her pain is real and is worthy of fusion," but that "I am ok with increasing her pain medications as an alternative to surgery." He adjusted her pain medications. [Id.].

Dr. Sloan continued to treat Savedra through the end of 2004, and beyond.  She continued to complain of pain and continued to reject surgery or epidural injections.  Dr. Sloan continued to adjust her medication to help with the pain. [Tr. 532-534].  At visits on September 30, 2004 and November 22, 2004, Dr. Sloan noted his opinion that she would be able to perform sedentary work. [Tr. 533, 534].

At the time of her decision, ALJ Perkins did not have the records of any of Savedra's visits to Dr. Sloan post-June 2004.  The ALJ was not aware that Savedra did in fact get a CT scan, and she therefore did not consider the results of the scan in her decision.  The ALJ further stated that there is no indication on the record that Savedra returned to see Dr. Sloan after June 2004.  As the later-submitted records reveal, Savedra in fact continued to see Dr. Sloan from June 2004 to at least April 2008. [Tr. 527-571].

The Appeals Council did consider Dr. Sloan's records, however, and concluded that they were essentially consistent with the rest of the record and did not undermine the ALJ's finding that Savedra was not entirely credible.  This conclusion is supported by the record.  A finding of a facet fracture does not necessarily imply a painful condition, as Dr. Sloan told Savedra she may have had this condition since birth; if so, it did not interfere with her ability to perform heavy work for the 12 years she served as a school custodian.

The ALJ also pointed to other instances in the record which support the finding that Savedra is not entirely credible with respect to her subjective complaints.  The ALJ noted:

> At the December 2004 hearing, Ms. Savedra testified that her back and leg pain is so much worse that she is considering back surgery. She stated that she hesitates because of her diabetes.  In contrast the evidence from her treating medical sources indicates that she is not a surgical candidate.  At the hearing, Ms. Savedra admitted that no one has actually recommended that she have surgery.

[Tr. 714].

Savedra did indeed testify at the hearing that, "I can't stand the [p]ain anymore, I mean, I'm thinking of having surgery because I can't stand it anymore really.  But I'm afraid to have surgery because of my diabetes." [Tr. 865].  But then she testified later in the hearing that Dr. Gelinas told

her she "wasn't a good candidate for back surgery," and that "because of my bypass and my diabetes that it wouldn't be a good idea to have back surgery on my back or on my legs because I would take a long time to heal." [Tr. 873-874]. Later the ALJ asked her again, "And you said you were thinking of having surgery on your back, who recommended that?" Savedra answered, "Well, nobody recommended it, sometimes I feel like having it but I don't think I will because I'm afraid because of my diabetes." [Tr. 879].

The ALJ considered Savedra's statement that she was "thinking of having surgery" because the pain was so great to be an indication of lack of credibility, because no doctor recommended surgery. As noted above, the question of surgery was raised by Dr. Gelinas and Dr. Sloan in the summer of 2004, but Savedra declined surgery in favor of conservative treatment with medication, because of her diabetes. Her statement later in the hearing that she only "feels like" having surgery could be seen as a clarification of her earlier statement that the pain caused her to "think of" having surgery.

While this Court, if it were sitting as the fact finder, might not have cast the same interpretation on Savedra's testimony as did the ALJ, this Court is not the fact finder and did not have the advantage of listening to Savedra in person or evaluating her demeanor as a witness. The ALJ's interpretation is supported by the record and by the later medical notes of Dr. Sloan, which confirmed that Savedra was not a good candidate for surgery. Dr. Sloan's records further indicate that he did not specifically recommend that she undergo surgery as a method of pain relief. The Court does not re-weigh the evidence or substitute its judgment for that of the Commissioner, Hackett v. Barnhart, 395 F.3d 1168, 117 (10th Cir. 2005), but rather ascertains whether the Commissioner's findings, including credibility findings, are supported by the record. Id..

In this case, the credibility finding is supported by record evidence, including indications that Savedra exaggerated her pain symptoms. "Because '[e]xaggerating symptoms . . . for purposes of obtaining government benefits is not a matter taken lightly by this Court,' we generally treat credibility determinations made by an ALJ as binding upon review." Gossett v. Bowen, 862 F.2d

802, 807 (10th Cir. 1988). The record also indicates that Savedra at one point refused treatment by a pain specialist, apparently on the advice of her attorneys, demanding instead an increase in narcotic medication; stated that she was considering surgery when it was not a viable option for her; and testified that she sometimes could not walk or even get out of bed, statements contradicted by her testimony that she took care of her husband, who was disabled by a stroke, on her own.

The ALJ also found that Savedra's complaints of pain were less credible than they otherwise would be, because she exhibited drug-seeking behavior. As noted above, this behavior is documented by Dr. Bhasker, who terminated his doctor-patient relationship with her because of it, and further indications appear in notes of Savedra's visit to the Socorro General Hospital emergency room in June 2000, when she became tearful during an examination, and then became angry and demanding when she was offered psychological, not medical, assistance for her complaints of a throat problem. The provider attempted to discuss an upcoming appointment for Savedra with a throat specialist, set for July, but Savedra insisted on receiving medication and left in anger when she did not get it. [Tr. 222].

Savedra implies that her demands for immediate and increased medication are signs of unbearable pain. However, at least one of her physicians felt that the demands were prompted by the fact that she was becoming dependent on the drugs. The ALJ had the advantage of assessing Savedra's credibility face-to-face, and the Court finds that there is record support for the finding that her subjective complaints were not entirely credible. As was true in Poppa v. Astrue, 569 F.3d 1167, 1172 (10th Cir. 2009), "there is sufficient evidence in the record to support the ALJ's determination that [claimant's] credibility about her pain and limitations was compromised by her drug-seeking behavior."

While the Appeals Council did not specifically discuss the effect of Dr. Sloan's records on the credibility finding of the ALJ, the Council stated that it considered the additional evidence submitted by Savedra in her request to reopen, and determined that the new evidence did not alter the credibility finding. The Court assumes that the Appeals Council did, in fact, examine Dr.

Sloan's records and consider them in making its determination that Savedra was not entirely credible.

> Plaintiff complains that . . . the Appeals Council wrote only that it had considered the additional evidence submitted "but concluded that neither the contentions nor the additional evidence provides a basis for changing the Administrative Law Judge's decision." . . . Yet, our general practice, which we see no reason to depart from here, is to take a lower tribunal at its word when it declares that it has considered a matter.

Hackett v. Barnhart, 395 F.3d 1168, 1172-73 (10th Cir. 2005).

The Court finds that the ALJ and the Appeal Council's determinations as to Savedra's credibility are supported by the record.

D.  Whether the Appeals Council Erred in Relying on the Grids

Savedra also contends that the Appeals Council erred in its determination that a finding of non-disabled could be made without resort to testimony by a VE, but rather on the basis of the Grids alone.  Savedra argues that her nonexertional functional limitations, including pain and mental impairments, require the use of a VE. [Doc. 22, at 10].

As discussed above, the Commissioner's finding that Savedra is capable of performing a full range of unskilled, sedentary work is supported by the record.  The Court has upheld the findings that Savedra did not suffer from a severe mental impairment, and that her subjective complaints of pain were not entirely credible.  The Commissioner may properly rely on the Grids, and need not call on the services of a VE, when a claimant's impairments do not render her incapable of performing a substantial majority of the work of a particular RFC, and when her subjective complaints are not fully credible.  Gossett v. Bowen, supra, at 806-07; Castellano v. Sec'y of Health and Human Servs., 26 F.3d 1027, 1030 (10th Cir. 1994); see also, Eggleston v. Bowen, 851 F.2d 1244, 1247 (10th Cir.1988) (presence of nonexertional impairment does not preclude use of Grids if nonexertional impairment does not further limit claimant's ability to perform work at the applicable level).

The Court finds no error in the Appeals Council's reliance on the Grids for its finding of non-disability.

**<u>Order</u>**

IT IS THEREFORE ORDERED that Plaintiff's Motion to Reverse or Remand [Doc. 17] is denied, and this case is dismissed with prejudice.

Lorenzo F. Garcia
United States Magistrate Judge